IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GABRIELA SOSA GAINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 1095 |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Gabriela Sosa Gaines has filed a motion to reverse and remand the Commissioner's decision denying her claim for disability benefits (doc. # 9), and the Commissioner has filed a motion asking the Court to affirm (doc. # 17). For the reasons that follow, we grant Ms. Gaines's motion to remand and deny the Commissioner's motion to affirm.

### I.

Ms. Gaines was laid off from work as an administrative assistant in May 2009 (R. 35, 46). She alleges that five months later, on October 14, 2009, at age thirty-seven, she became disabled when she injured her back while working out with her personal trainer (R. 182). Before turning to the legal analysis, we review the medical record, the administrative hearing transcript, and the Administrative Law Judge's ("ALJ's") opinion in turn.

### A.

Ms. Gaines's first post-injury medical visit was with John Broadnax, M.D., of the Pain Specialists of Greater Chicago, on October 30, 2009. On that date, Dr. Broadnax noted that Ms. Gaines was tender in her thoracic spine (upper back) but not her cervical spine (neck), had no

---

[1]On March 3, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 5, 6).

limits in her range of motion ("ROM") and had normal sensory responses in her upper extremities (R. 329-32). Multiple MRIs the following month showed no significant disc bulge or herniation, minor retrolisthesis (misalignment) in the neck, and shoulder arthritis (R. 247, 250, 252, 296).

Ms. Gaines reported increasing upper back pain on November 30, 2009 (R. 324-25), and on December 9, 2009, she received an epidural steroid injection in her thoracic spine (R. 333). The injection initially decreased her pain, but it came back even worse (R. 322-23). Ms. Gaines received physical therapy for two weeks in January 2010, but she reported thoracic spine pain with all motion, and her strength and ROM did not improve (R. 377-85). On January 13, 2010, Ms. Gaines reported that her pain had spread to her mid and lower back, and she had numbness and weakness in her arms, her left worse than her right (R. 320-21). Dr. Broadnax prescribed pain medication including Tramadol, Lyrica and Percocet (*Id.*). On January 27, 2010, he noted that Ms. Gaines reported increased neck and upper extremity pain (R. 318).

On January 21, 2010, Ms. Gaines had an electromyography ("EMG") neurological evaluation of her spine, which showed some nerve sensory loss on her right side (R. 257). But, a follow-up EMG and nerve conduction study the next month were normal, with no evidence of mononeuropathy or lumbosacral radiculopathy in her lower extremities (R. 292). In April 2010, Dr. Anthony DiGinafilippo, M.D., of West Suburban Neurosurgical Associates, opined that Ms. Gaines had no "significant problems," but possibly some mild degenerative changes (R. 336-37).

In February 2010, an MRI of Ms. Gaines's lumbar spine (lower back) showed some facet degeneration, minimal disc protrusion, mild spinal stenosis (narrowing), and spondylolisthesis (a condition in which a vertebra moves out of position onto the bone below it) (R. 278, 299-300). That month, Ms. Gaines also had complaints of headaches, upper back pain between the scapulas

(shoulder blades), bilateral arm pain and bilateral leg pain (R. 315-16). She received a lumbar facet joint injection on March 10, 2010 (R. 334), but by May 2010, Ms. Gaines reported that her pain had increased 100 percent, averaging nine on a ten-point scale (R. 311). She received trigger point injections over the most tender areas (R. 309-10), but her neck and head pain were worse in June 2010 (R. 307). Between March and July 2010, Ms. Gaines also received aqua therapy; she felt good in the water but complained that her pain returned when out of water (R. 340-72).

In September 2010, Ms. Gaines continued to complain to Dr. Broadnax of neck, back, arm and leg pain (R. 304-05). Pain medication reduced her pain sixty percent, but she continued to have trouble sleeping and functioning (*Id.*). Dr. Broadnax recommended continued aquatherapy, Lyrica, Cymbalta and a psychiatric evaluation (*Id.*). In November 2010, Ms. Gaines reported the need to sit or lie down several times a day to control the pain (R. 294). Dr. Broadnax opined that she had myofascial pain syndrome (*Id.*).[2] He prescribed a pain patch for acute pain (R. 301), and noted that Ms. Gaines did not have a psychiatric evaluation due to loss of insurance coverage (R. 389).

On March 11, 2011, Ms. Gaines sought treatment for her pain at Northwestern Hospital. At the appointment, she was tender to palpation in her back and neck, and she was very tearful and could not stop crying (R. 764-65). The next day, Ms. Gaines was voluntarily admitted herself to Northwestern Hospital as a possible danger to herself because she was depressed and dysthymic, with passive suicidal ideation but no plan (R. 436-39, 443). She explained that the Northwestern physician had told her the day before that he did not know if he could help with

---

[2] Myofascial pain syndrome is a chronic pain disorder where pressure on sensitive points in a person's muscles causes pain in seemingly unrelated parts of the body. The discomfort associated with myofascial pain syndrome persists or worsens over time. http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195. Myofascial pain syndrome is caused by a stimulus, such as pressure, that sets off trigger points in the muscles. Factors that may increase a person's risk of developing myofascial pain syndrome include an acute muscle injury or continual muscle stress as well as stress and anxiety. http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/risk-factors/con-20033195.

her problems, and this "pushed her over the edge," leaving her feeling hopeless (R. 425). She also felt guilt over being a bad mother because she was often angry and could not do anything with her kids (*Id.*). Ms. Gaines described becoming progressively depressed since her injury in October 2009, but she had no past psychiatric treatment (R. 426). She still enjoyed spending time with her children and family, and she had good support from her brothers and sisters, but few friends (R. 434).

Ms. Gaines's affect rapidly stabilized with medication: Cymbalta (anti-depressant) and Gabapentin (mood stabilizer) (R. 426, 437). By March 14, 2011, her affect was "quite bright," and she enjoyed participating with a group and interacting with others on her unit (R. 450). Her pain was also relatively well-controlled (*Id.*). She was discharged on March 15, 2011, with a diagnosis of adjustment disorder, chronic, with depressed mood (R. 391-92, 451).

After her hospitalization, Ms. Gaines sought treatment for her pain with physician's assistant Pat Maier at Erie West Town Health Center on March 23, 2011 (R. 516). Spinal MRIs from that month showed little change from previous MRIs -- minimal or mild spurring, mild degenerative changes, and a tiny central disc protrusion (R. 423-24) -- and a brain MRI showed mild non-specific white matter but no acute intracranial abnormality (R. 421).

On March 30, 2011, Scott A. Kale, M.D., J.D., M.S., conducted an internal medicine consultative examination for the Department of Disability Services ("DDS"). He noted that Ms. Gaines's gait was mildly antalgic but she could ambulate ten feet unassisted, and that she sat with no acute distress but stood for part of the interview due to complaints of low back pain (R. 415). Ms. Gaines had pain but no loss of sensation in her shoulders, elbows, wrists, hips, knees, ankles and cervical spine, and decreased ROM in her lumbar spine (R. 416-17).

On April 4, 2011, Ms. Gaines had a spinal consultation with Wellington K. Hsu, M.D. (R. 781). Dr. Hsu found that she had full ROM in her lumbar and cervical spine and in all joints in the upper and lower extremities and 5/5 strength in all muscle groups in the lower extremities (R. 782). Ms. Gaines had normal gait and could tandem and heel and toe walk without difficulty (*Id.*). Nevertheless, Ms. Gaines exhibited "exquisite tenderness" to palpation in the upper and lower back and neck, which Dr. Hsu opined was likely due to myofascial pain syndrome (*Id.*). Dr. Hsu recommended "conservative treatment with trigger point injections" and a consultation with a rheumatologist (*Id.*).

That same day, Ms. Gaines visited Terry L. Nicola, M.D., for a sports medicine consultation at UIC Medical Center (R. 842). Dr. Nicola noted mild decrease in strength in her extremities, but attributed to this to Ms. Gaines's "overall slight apprehension and pain avoidance" (R. 844). Dr. Nicola ordered a rib x-ray, which ruled out a rib fracture (R. 846), a chest x-ray, which was normal (R. 890-92), and a back MRI, which was normal except for mild multilevel degenerative disk disease and a small central disk extrusion (R. 474-75).

On May 3, 2011, a Mental Health Progress Note from Matthew Neverusky at Erie West Town Health noted that Ms. Gaines felt overwhelmed and worthless, and she was very tearful and unable to look him in the eye (R. 910). He assessed her with a Global Assessment Functioning score ("GAF") of 51 and diagnosed her with major depressive disorder (*Id.*). At their meeting on May 10, Ms. Gaines reported feeling anger and sadness at not being able to be her old self, and she avoided eye contact and sat hunched over (R. 911). On May 17, she sat silently with clutched fists for fifteen minutes and would not respond to Mr. Neverusky's questions (R. 912). Ms. Gaines eventually stated that she felt like giving up because no one could

help with her conditions, and she worried Mr. Neverusky would think she was faking or crazy (*Id.*).

On May 16, 2011, Laron Phillips, M.D., conducted a psychiatric evaluation of Ms. Gaines for DDS. Dr. Phillips noted that Ms. Gaines reported persistent sad mood, poor appetite, insomnia, anhedonia (loss of ability to experience pleasure), feelings of guilt and worthlessness, low energy, difficulty concentrating, psychomotor agitation and suicidal ideations, as well as panic attacks due to worry over life stressors (R. 640). She was cooperative and appropriate during the interview, but was at times tearful and appeared to have a panic attack (R. 641). Her mood was depressed and her affect was very dysphoric, and she had rather poor eye contact and some psychomotor slowing (*Id.*). Ms. Gaines performed normally on memory and number tests (*Id.*). Dr. Phillips diagnosed her with major depressive disorder, severe, recurrent, and anxiety disorder, not otherwise specified ("NOS") (*Id.*).

M.W. DiFonso, Psy.D., completed a mental residual functional capacity ("RFC") assessment based on Dr. Phillips's examination (R. 84). Dr. DiFonso opined that Ms. Gaines had severe affective disorder and non-severe anxiety disorder, and assessed mild restriction in activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and one or two episodes of decompensation of extended duration (R. 85). Specifically, Dr. DiFonso indicated that she was moderately limited in: understanding, remembering and carrying out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday/week without interruptions from psychologically based symptoms; ability to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public and supervisors; and ability to manage intensively demanding social

situations. (R. 88-90). Dr. DiFonso further concluded that Ms. Gaines's cognitive and attentional skills were intact and adequate for simple one-two step work tasks (R. 90).

On May 25, 2011, David Walega, M.D., of Northwestern's Anesthesiology and Pain Medicine, opined that Ms. Gaines "is a troubled, anxious and depressed lady with 18 months multiple pain complaints" (R. 796). He reported that she broke down in tears at least three times in forty-five minutes and presented with many pain behaviors, including tenderness in her back and patchy numbness in her wrists (R. 796). Dr. Walega reviewed Ms. Gaines's radiological reports but determined that he did not have enough clinical information to make a diagnosis (R. 797). He stated that "her depression and poor psychological function coping is remarkable," and that "[t]here is clearly myofascial pain present, but is extremely diffuse, may be related to abnormal posture and use of assist[ive] devices which [he did] not think [we]re necessary" (Id.). Dr. Walega opined that Ms. Gaines's spine issues were not large enough to be causing the severity of symptoms she described and did not explain her upper extremity symptoms (R. 798). He "strongly" recommended the Rehabilitation Institute of Chicago's pain program for multidisciplinary functional restoration, but Ms. Gaines's husband was angered by this, stating "so you are saying there is nothing wrong with her? That's what everyone tells us" (Id.).

On June 14, 2011, Ms. Gaines reported decreased sensation to her upper and lower extremities. Dr. Nicola had difficulty examining Ms. Gaines because of her pain, but found that her shoulder abduction and elbow extension were decreased bilaterally around 4/5, with 5/5 strength throughout, and decreased lower extremity movement (R. 840). He gave her a prescription for a back brace for increased spine stability (Id.).

On June 15, 2011, B. Rock Oh, M.D., filled out a physical RFC report for DDS based on the medical records. He opined that Ms. Gaines should be limited to unskilled, light work (R.

91). Specifically, he stated that she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and stand, walk or sit (with normal breaks) about 6 hours in an 8 hour workday (R. 87). He stated that Ms. Gaines had limited ability to push and/or pull in lower extremities, but no manipulative limitations (R. 87-88). Further, she required a hand-held assistive device for ambulation and had some postural limitations due to low back pain and left lower extremity weakness (*Id.*).

Ms. Gaines reported worsening pain throughout the summer of 2011, including functional limitations so serious that she had trouble sleeping, caring for her children, dressing, bathing, doing her hair, shaving, getting on and off the toilet and cleaning herself after using the toilet (R. 212). On August 16, 2011, Dr. Nicola noted that Ms. Gaines had shooting pains in her neck with movement and exquisite pain raising her arms bilaterally greater than 90 degrees and with forward flexion of her hips (R. 836-37). Her pain improved after a subscapular corticosteroid injection on August 22, 2011 (R. 834), but only temporarily (R. 460-62).

On August 31, 2011, Ms. Gaines resumed physical therapy. She complained of pain and spasms throughout her spine and shoulders, and she had decreased ROM, strength and sensation due to pain and disuse, but for the first month of therapy, she tolerated treatment "fairly" (R. 851-53, 869, 871). From September 27 through November 14, 2011, however, Ms. Gaines had increasing left arm numbness and weakness, worsening back pain, and she began to drag her right leg (R. 859, 861, 863-64, 866). In addition, Ms. Gaines was often tearful and appeared to be in emotional stress (R. 859). The physical therapist opined that her "symptoms remain widespread and inconsistent with musculoskeletal pathology. It is likely that central sensitization

contributes to [patient's] pain, but complaints of electrical pain throughout limbs is consistent with sympathetically mediated pain" (R. 857).[3]

Ms. Gaines sought reconsideration of the DDS mental and physical RFC assessments, submitting additional medical evidence from August and September 2011 which she claimed showed that her pain and functional limitations have worsened since June 2011 (R. 95-96). Both RFCs were affirmed on reconsideration (R. 101-03, 109).

Ms. Gaines received a psychiatric evaluation from Carlos E. Nunez, M.D., of Erie West Town Health, on October 12, 2011 (R. 913). He assessed her with anxiety disorder and a GAF of 50, and he increased her prescription for Cymbalta (R. 915). The next day, Ms. Gaines tearfully told Mr. Neverusky that she wanted to end it because she was frustrated she was not getting better and her condition was affecting her husband and kids, but she denied suicidal intent or plans (R. 916). On October 20, 2011, she told Mr. Neverusky that she hides her sadness from her children by going into the bathroom to cry, pull her hair, bite and scratch herself (R. 917). He assessed her with a GAF of 48, anxiety disorder and depressive disorder NOS (*Id.*). On November 9, 2011, Dr. Nunez noted that Ms. Gaines visibly struggled to walk (R. 918). He described her affect as dysphoric and anxious, and her insight and judgment was poor to fair (*Id.*). He also noted that she was not taking her medications due to reported complications (*Id.*).

---

[3]Sympathetically mediated pain is a subcategory of reflex sympathetic dystrophy syndrome, also referred to as Complex Regional Pain Syndrome ("CRPS") Type 1. This type of CRPS occurs after an illness or injury that did not directly damage the nerves in a person's affected limb. It is not well-understood why these injuries can trigger CRPS, but it may be due to a dysfunctional interaction between the central and peripheral nervous systems and inappropriate inflammatory responses. Symptoms may change over time and vary from person to person, but may include, among other things: burning or throbbing pain, usually in the arm, leg, hand or foot; swelling of the painful area; changes in skin temperature, color and texture; joint stiffness, swelling and damage; muscle spasms, weakness and loss; and decreased ability to move the affected body part. *See* http://www.mayoclinic.org/diseases-conditions/complex-regional-pain-syndrome/basics/causes/con-20022844; http://www.mayoclinic.org/diseases-conditions/complex-regional-pain-syndrome/basics/symptoms/con-20022844; http://www.ncbi.nlm.nih.gov/pubmed/9279540.

From December 2011 through February 2012, Ms. Gaines continued to complain to Dr. Nicola of extreme pain (10/10) in her back and neck which radiated to her extremities (R. 936, 943). Dr. Nicola stated that due to her perceived pain, he had difficulty completing Ms. Gaines's physical examination, but he reported that she had full ROM in her elbows and wrists (R. 944). Cervical and thoracic MRIs in January 2012 were normal except the thoracic MRI showed a degenerative disc at T6-T7, with mild mass effect upon the cord (R. 933, 937-38). Ms. Gaines received dry needling in three places on January 24, 2012, but it provided only temporary relief (R. 932, 941). On February 14, 2012, Dr. Nicola noted that she continued to have upper and lower back, neck and arm pain but her sensation was intact her and her arm range of motion was full (R. 933). She took Cymbalta, Nortriptyline, Aciphex, hydrocodone and Zofran and wore a back brace (*Id.*). Her pain could reduce to 3 or 4 out of 10 at rest, but could rise to over an 8 out of 10 (*Id.*). While there were no spinal changes, her lower extremity function seemed to have slowly deteriorated to the point she had difficulty standing upright (R. 933-34).

The last medical record before the ALJ hearing was a "pain service initial consult" from June 11, 2012. Fathima Kolonda, M.D., wrote that Ms. Gaines wore a brace and walked with a cane, and she reacted painfully to palpation of her cervical and thoracic spine and shoulders (R. 947). She had full strength in her lower extremities and only 3/5 strength in her upper extremities, but Dr. Kolonda noted that this "could be [due to] poor effort" (R. 948). Ms. Gaines was tearful at the meeting, and Dr. Kolonda wrote that she "discussed with patient at length that her complaints do not seem congruent with her findings on imaging. Also discussed that she seems very depressed and pain can be a manifestation of severe mood disorder" (R. 947-48).

**B.**

During the hearing before the ALJ on July 17, 2012, which lasted a little less than one and one-half hours, Ms. Gaines testified that she lives with her husband and three children, ages 12, 9, and 5, but she stays with her in-laws at times so they can take care of her (R. 35-37). Ms. Gaines described back pain that radiated down her arms and legs, zapping pain in her shoulders, and a very weak, achy, and often numb left arm (R. 40-41, 47-48). She testified that due to the pain, she relies on her husband to help shower and bathe her, dress her, brush her hair, brush her teeth (though sometimes she just uses mouthwash because cannot raise her hand up to her face), get out of bed (though she keeps her bed on the floor for ease of access), get on and off the toilet and "squirt" her if she is in too much pain to wipe (R. 45, 50-52, 55). Ms. Gaines attributed a hospitalization for kidney infection in April 2010 to her inability to wipe properly after using the toilet (R. 46-47). She does not drive because she cannot turn her head (R. 37-38); in fact, her husband helps buckle her seat belt because it is hard for her to reach behind her (R. 57). Her husband also does all the housework and shopping (*Id.*).

Ms. Gaines stated that she began using a cane in 2009 because she kept falling, and she was prescribed a rolling walker in April 2011 to help with balance; she uses the walker "all the time" at her house, except in the bathroom, but out of the house she prefers to use the cane unless she will be out for a long time (R. 44-45). She also uses a back brace for stability, but it is painful (R. 49). At the hearing, she got up and down "a lot" because, she explained, if she sits too long, she has radiating pain that goes down her legs (R. 40-41, 45).

Ms. Gaines testified that she can stand without a cane five to ten minutes and sit for ten to fifteen minutes at a time before the pain in her back or her legs gets too bad to tolerate (R. 57-58). With a cane, she can walk thirty feet, but she has to stop and take breaks (R. 59). She can lift

about half a gallon of milk, but cannot use a computer or screw in a light bulb because it is too painful to reach (R. 40-41, 48). She spends her days trying to alleviate her pain by alternating sitting and standing and laying down (R. 62).

Ms. Gaines's pain makes her irritated and short tempered with her children, and she vents her anger by biting or scratching herself (R. 48, 57). She testified that her pain affects her concentration and has taken away her social life (R. 55). Also, she has lost twenty to thirty pounds since October 2009, from about 200 to 180 pounds; she is five feet, two inches tall (R. 59-60). Ms. Gaines stated that she suffers migraines two to three times per month (lasting two or three days), but she does not take medication for them; instead, she stays quietly in the dark to relieve them (R. 55-56).

The vocational expert ("VE"), Brian Harmon, a certified rehabilitation counselor, testified next that Ms. Gaines performed her past work as an administrative and accounting clerk at the medium and semi-skilled or skilled levels (R. 65). The ALJ offered a hypothetical of an individual similar to Ms. Gaines who was limited to sedentary work and who, "from a concentration, persistence and pace standpoint, due to mental health limitations as well as limitations from pain, would be limited to understanding, remembering and carrying out simple work instructions, but unable to perform any complex decision-making and could perform workplace judgments, commensurate with the requirements of unskilled work," and no fast-paced production requirements (R. 66-67). The VE responded that the individual could not perform Ms. Gaines's past work, but could be an account clerk, order clerk, or telephone quotation clerk (R. 67-68). If the individual would need a sit/stand option, such as standing once an hour for five minutes, the individual could be an order clerk, sorter or surveillance system monitor, though sorter may be ruled out if a cane was needed for standing (R. 68-69).

If the individual could not do frequent bilateral reaching, the VE stated that this may rule out account clerk and telephone quotation clerk, but the order clerk position could be done with frequent one handed reaching (R. 70-71). If the claimant was limited to no more than occasional reaching, fingering and handling, the only job remaining would be surveillance system monitor (R. 71). The VE explained that an account clerk requires occasional fingering (fine manipulation) and frequent handling (gross manipulation), while an order clerk, telephone quotation clerk and sorter require frequent fingering and handling (R. 77-78). Handling is not required of a surveillance system monitor (*Id.*). The ALJ indicated that if he found the claimant limited to only occasional reaching, fingering and handling, he would find her disabled (R. 72). If the individual was limited to lifting only five pounds, the VE testified that only the sorter position would be eliminated (R. 72).

In determining what activity the jobs he cited required, the VE relied on what he called a conservative estimate based on "people that [he's] seen perform the work," jobs he utilizes in case management and job placement for his clients, how the positions "are commonly performed in the economy," his own labor market research (unpublished) and the Bureau of Labor Statistics (BLS) (R. 73-74). The ALJ said he would not admit into evidence the VE's research, because he did not think it was necessary to do so (R. 75).

## C.

In his written opinion, dated September 28, 2012, the ALJ found that Ms. Gaines had the following severe impairments: thoracic disc disease, myofascial pain syndrome, scapular impingement, major depressive disorder and anxiety disorder (R. 12). The ALJ found Ms. Gaines's other alleged impairments to be non-severe. As to obesity, the ALJ noted that Ms. Gaines has lost weight, and her weight has not been an aggravating factor with her back or

shoulder condition (R. 12). As to headaches, the ALJ doubted Ms. Gaines's allegations of severe functional limitations because she does not take medication for them and she did not mention them at a December 2011 appointment (R. 12-13 citing 28F/14). In addition, the ALJ determined that Ms. Gaines's kidney issue had been resolved with treatment (R. 13).

Next, the ALJ found that none of Ms. Gaines's impairments, singly or in combination, meet or equal a Listing, including 1.04 (disorders of the spine); 12.04 (affective disorder) and 12.06 (anxiety-related disorder) (R. 13). In applying the Paragraph B criteria to Ms. Gaines's mental impairments, the ALJ found only mild restriction in ADLs because although she reported severe limitations in this area, the ALJ found that she "extremely exaggerated her limitations" and that the diagnostic evidence and consultative examination results did not support such extreme difficulties with simple activities (*Id.*). The ALJ found no difficulties in social functioning because Ms. Gaines maintained close personal relationships and reported no problems getting along with others (*Id.*). The ALJ determined that Ms. Gaines has moderate difficulties in maintaining concentration, persistence, or pace because her depression, combined with her physical pain, reduced her ability to concentrate (R. 14-15). Finally, the ALJ determined that Ms. Gaines had experienced at most one episode of decompensation of extended duration, when she was briefly admitted to the hospital in March 2011 for depression (R. 14).

The ALJ determined that Ms. Gaines has the mental and physical RFC to perform sedentary work, limited to understanding, remembering, and carrying out simple work instructions, making simple workplace judgments commensurate with the requirements of unskilled work, and tolerating occasional changes in the work setting, but not fast-paced production requirements (R. 14).

After reviewing Ms. Gaines's testimony, the ALJ found that her "impairments could reasonably be expected to cause some symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity" (R. 16). As a basis for that finding, the ALJ explained that "[i]t is clear that the claimant's complaints are far out of proportion to the objective evidence," which "shows very minimal findings" (R. 19). "In fact, her hearing presentation was so exaggerated that her complaints are difficult to accept at all" (R. 20). The ALJ found it "difficult to accept her allegation[s]" that she was so limited that she needed help wiping after using the bathroom and brushing her teeth (*Id.*). The ALJ also found "it is highly questionable that the reported injury from the personal training session caused the level of symptoms she complains of" (R. 17).

The ALJ reviewed several medical reports that he believed showed that Ms. Gaines's testimony was not believable. The ALJ noted a March 2011 consultative examination that was "essentially normal," including full ROM in elbows and wrists, "except for some decreased range of motion in lumbar spine" (R. 20). In addition, the ALJ noted EMGs were negative and MRIs showed only shoulder arthritis and minimal degenerative changes in her spine (including, in May 2011, a small central disk extrusion and in January 2012, a "mild mass effect" on the cord), "which do not support her complaints" (R. 16-17). The ALJ noted that a January 2012 doctor's report stated that Ms. Gaines's "complaints do not seem congruent with her findings on imaging" and that "pain could be a manifestation of severe mood disorder" (R. 17). In addition, in November 2011, a treatment note stated that Ms. Gaines's symptoms remained widespread and inconsistent with her musculoskeletal pathology (*Id.*). The ALJ also noted a June 2011 appointment with Dr. Nicola, at which Ms. Gaines complained of severe (10/10) pain in her

back, buttock, shoulders and hands, but she could not point to any aggravating symptoms, although she had some decreased ROM and sensation (R. 16-17).

Regarding Ms. Gaines's physical impairments, the ALJ agreed with the assessment of DDS physician Dr. Oh (and Dr. Wabner, affirming on reconsideration), who opined that Ms. Gaines was limited to light work (R. 17). But, "in giving the claimant every benefit and consideration, [the ALJ] further reduced her exertional functional capacity to sedentary work" (*Id.*). Although Ms. Gaines's physician's assistant wrote a letter to her health club on March 24, 2011, stating that she is "incapacitated," the ALJ gave this opinion "less weight" because it was not from a doctor, was for the purpose of assisting the claimant in getting reimbursed health club fees, and was not supported by the medical evidence of record that showed only minimal findings (R. 21).

"On the other hand, [the ALJ found] the claimant was credible" as to her mental impairments, including her allegations that she felt depressed, frustrated and angry (R. 20). The ALJ opined that based on her doctors' reports and "[g]iven the incongruity between the objective evidence and the subjective complaints, it is possible that the claimant's physical pain may be related to her psychological issues," including mental depressive disorder and anxiety disorder (R. 18-20). The ALJ noted that Ms. Gaines was hospitalized for depression and anxiety in March 2011, and that on May 16, 2011, Dr. Phillips diagnosed her with major depressive disorder, severe, recurrent, and anxiety disorder NOS (R. 18). The ALJ also noted her tearfulness and her reports of suicidal thoughts, panic attacks, and episodes of frustration at her condition and its effect on her family, leading her to pull her hair, bite and scratch herself (R. 18-19).

Nevertheless, the ALJ held that "the evidence does not establish that the claimant is precluded from competitive employment due to the mental impairments" (R. 18). The ALJ stated

that Ms. Gaines's GAF scores, ranging from 48 to 51, represent "only a snapshot in time" and are not consistent with her overall treatment history, which shows only moderate symptoms (R. 21). The ALJ agreed partially with (gave "some weight" to) the opinions of DDS doctor Dr. DiFonso, who opined that Ms. Gaines could "perform simple work with some additional limitations" (R. 19). However, the ALJ disagreed with Dr. DiFonso's opinion that Ms. Gaines had moderate social limitations because while she testified that she could no longer attend her children's games, get the mail, or answer the telephone, Ms. Gaines maintained close relationships with her family members, was cooperative and behaved appropriately at Dr. Phillips's examination, and her treating doctors never noted that she was limited socially (R. 19-20).

The ALJ explained that based on the VE's testimony, he found that jobs exist in significant numbers in the national economy that Ms. Gaines can perform, specifically charge account clerk, order clerk and telephone quotation clerk (R. 21-22). These were sedentary jobs that allowed for the additional limitations set forth in Ms. Gaines's RFC (R. 22).

## II.

Plaintiff argues for a reversal of the ALJ's opinion and a remand. "We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence, which [has been] described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although [this court] will not reweigh the evidence or substitute our own judgment for that of the ALJ, [this court] will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow [the] reviewing

court [ ] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

While Ms. Gaines raises a number of challenges to the ALJ's decision, we focus on two aspects of the decision that we find require remand: the ALJ's analysis of Ms. Gaines's complaints of pain and functional limitations, and his determinations regarding her mental impairments.

### A.

The ALJ determined that Ms. Gaines suffered from severe thoracic disc disease, myofascial pain syndrome, scapular impingement, major depressive disorder and anxiety disorder (R. 12). Despite finding that Ms. Gaines suffered from severe disorders which could cause pain, the ALJ did not believe Ms. Gaines's complaints of pain, stating that "the claimant's complaints are far out of proportion to the objective evidence," which "shows very minimal findings" (R. 19). This conclusion was erroneous for several reasons.

*First*, the ALJ's determination that the objective evidence does not support Ms. Gaines's complaints of pain ignores key evidence to the contrary. It is well settled that an ALJ may not rely on pieces of evidence in the record that support his conclusion that a claimant is not disabled, but ignore evidence that undermines that conclusion. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014). "This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence." *Id.*

Here, the record shows that after examining Ms. Gaines in November 2010, April 2011, and May 2011 respectively, three separate doctors diagnosed her with myofascial pain: Dr. Broadnax (R. 294), Dr. Hsu (R. 782), and Dr. Walega (R. 797). While the ALJ "note[d] she was diagnosed" with this disease (R. 16), he ignored the fact that three physicians, including a spine

specialist and a pain medicine specialist, agreed with this diagnosis. In fact, it is unclear from the ALJ's opinion whether he even considered the medical reports from Dr. Hsu and Dr. Walega. By ignoring this relevant evidence and failing to explain why it does not support plaintiff's complaints of pain, the ALJ failed to build a logical bridge between the evidence and his conclusion that Ms. Gaines was not disabled. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (holding that the ALJ erred by failing to take into account several of the claimant's diagnosed physical impairments); *see also Durr-Irving v. Colvin*, No. 13-3275, 2015 WL 367138, at *5 (7th Cir. Jan. 29, 2015) (holding that because the ALJ did not discuss what significance, if any, a recent diagnosis of pelvic organ prolapse would have on the claimant's ability to sustain full-time employment, the ALJ did not adequately consider the claimant's impairments).

*Second*, the ALJ's decision to reject Ms. Gaines's allegations about the intensity and persistence and limiting effects of her pain because they were unsubstantiated by the objective medical evidence was error. *See* 20 C.F.R. § 404.1529(c)(2). An ALJ may not reject a claimant's statements about the intensity and persistence and limiting effects of her pain "solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2). "Pain can be severe to the point of being disabling even though no physical cause can be identified. . . ." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

Despite Ms. Gaines's consistent complaints of pain and functional limitations -- and the fact that she wore a back brace, used a cane or walker and shifted position often at the hearing -- the ALJ determined that Ms. Gaines's complaints of pain were not credible because radiological and physical testing showed only mild issues (R. 16-17). The ALJ found "her hearing presentation was so exaggerated" simply because Ms. Gaines's allegations of functional

limitations -- including that she needed help using the bathroom and brushing her teeth -- were so extreme as compared to the minimal objective findings (R. 20). "[D]iscounting pain testimony that can't be attributed to 'objective' injuries or illnesses -- the kind of injuries and illnesses revealed by x-rays" is an error that requires reversal and remand. *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015).

Moreover, the ALJ's reliance on what he saw as the lack of objective medical evidence to support his finding that Ms. Gaines's complaints of pain incredible is hard to square with his finding that it was "plausible," as suggested in her doctors' treatment notes, that Ms. Gaines's physical pain and complaints may be due to psychological issues (R. 18-20). If a complaint of disabling pain has psychological origins, the absence of objective medical evidence of a physical source for that pain should not end the inquiry.

It is well-settled that an ALJ "must incorporate all of the claimant's limitations supported by the medical record." *Yurt*, 758 F.3d at 857. However, the ALJ did not account for the pain Ms. Gaines may have suffered due to psychological issues. The fact that Ms. Gaines's pain may have stemmed from psychological rather than physical issues does not excuse the ALJ's failure to credit and account for her complaints of pain and functional limitations. "There's nothing unusual about a person's having disabling symptoms that, though real, the doctors cannot explain—especially psychosomatic symptoms," which the ALJ acknowledges Ms. Gaines's symptoms "may well have been." *Williams v. Colvin*, 757 F.3d 610, 615 (7th Cir. 2014).[4] As in *Williams*, the ALJ erred by ignoring the possibility that the combination of psychiatric problems and physical problems -- "the physical symptoms aggravating the psychiatric symptoms, and the

---

[4]"Somatic symptom disorder is a long-term (chronic) condition in which a person has physical symptoms that involve more than one part of the body, but no physical cause can be found. The pain and other symptoms people with this disorder feel are real, and are not created or faked on purpose." http://www.nlm.nih.gov/medlineplus/ency/article/000955.htm.

psychiatric symptoms in turn aggravating the physical symptoms" -- rendered Ms. Gaines disabled. *Id.* On remand, the ALJ should consider how Ms. Gaines's pain, whether it was caused by her mental or physical impairments, would affect her ability to work.

## B.

In addition, the ALJ's analysis of Ms. Gaines's mental impairments was inadequate. The ALJ determined that Ms. Gaines suffered from severe major depressive disorder and severe anxiety disorder (R. 12), and found that Ms. Gaines's allegations as to her mental impairments -- including that she felt "depressed, frustrated, and angry such that [] she bites herself or pulls her hair" -- were credible (R. 20). Despite these findings, the ALJ determined that Ms. Gaines had only moderate limitations in concentration, persistence or pace, which the ALJ accounted for in the RFC by stating: "can understand, remember, and carry out simple work instructions. She can make simple workplace judgments commensurate with the requirements of unskilled work. In addition, the claimant can tolerate occasional changes in the work setting in terms of work processes and products. Finally, she cannot tolerate fast-paced production requirements" (R. 14).[5] The ALJ's determination as to Ms. Gaines's mental RFC was not supported by substantial evidence.

---

[5]Plaintiff initially argues that the RFC's limitations do not adequately account for moderate limitations in concentration, persistence or pace (Pl.'s Br. at 9). We disagree. The limitations in the RFC go beyond "simple work" and would account for such moderate limitations. *See Seamon v. Astrue*, 364 Fed. App'x 243, 248 (7th Cir. 2010) (holding that the ALJ captured the claimant's moderate limitation in concentration, persistence, and pace when he included a restriction of "no high production goals"); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545) (noting that mental limitations in the RFC may account for limitations on a claimant's ability to work, including limitations in "understanding, remembering, and carrying out instructions, and in responding appropriately to . . . work pressures in a work setting.") Plaintiff's reliance on *O'Connor-Spinner*, 627 F.3d at 618-19, is misplaced because "[t]hat case . . . dealt with whether the ALJ had posed appropriate hypotheticals [which had omitted limitations in concentration, persistence or pace] to the vocational expert -- not whether the ALJ's RFC determination was correct." *Bates*, 736 F.3d at 1093 n.6; *see also Yurt*, 758 F.3d at 859 (distinguishing an argument that an RFC insufficiently accounted for the claimant's mental limitations from an argument that the ALJ's hypothetical to the VE was insufficient for omitting limitations based on concentration, persistence, or pace). The ALJ included moderate limitations in concentration, persistence or pace to the VE in this case.

*First*, the ALJ failed "to address all of the evidence and explain the reasoning behind the decision . . . such that we could understand the ALJ's logical bridge between the evidence and the conclusion." *Moore*, 743 F.3d at 1124. Although the ALJ stated that he agreed with Dr. DiFonso that Ms. Gaines had moderate limitations in concentration, persistence or pace, the ALJ did not include in the RFC several of the limitations found by Dr. DiFonso. Dr. DiFonso had opined that Ms. Gaines's limitations in concentration, persistence or pace would limit her not only to understanding, remembering and carrying out detailed instructions, but would also limit her ability to maintain attention and concentration for extended periods and to complete a normal workday/week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (R. 85, 88-90). The ALJ erred by omitting these additional mental limitations from Ms. Gaines's RFC without any explanation as to why he did so.

*Second*, the ALJ did not adequately explain why he disagreed with Dr. DiFonso's opinion that Ms. Gaines had moderate social limitations. The ALJ determined that Ms. Gaines had no social limitations because she "can maintain close personal relationships" and "reported having no problems getting along with others," including family members (R. 13, 19-20). The ALJ also concluded that Ms. Gaines demonstrated "cooperative" and "appropriate behavior" at her medical examinations (R. 19). This determination, however, is at odds with the ALJ's acknowledgement that at several appointments, she maintained poor eye contact, and at one point, she sat with her hands clenched and did not respond to her therapist's questions (R. 18). In addition, we question whether an ability to get along with family members automatically translates to an unlimited ability to get along with co-workers or members of the public in a workplace setting. By failing to explain why he found Ms. Gaines nevertheless had no social

22

limitations, "the ALJ deprived us of any means to assess the validity of the reasoning process." *Moore*, 743 F.3d at 1124-25.

*Third*, the ALJ failed to adequately explain why he dismissed Ms. Gaines's GAF scores. The ALJ stated that her scores, which ranged from 48 to 51, represented "only a snapshot in time" and were inconsistent with her overall treatment history, which showed only moderate symptoms (R. 21). We do not consider it accurate to label three GAF scores as merely a "snapshot in time." To begin with, while two of the GAF scores were eight days apart in October 2011 (R. 915, 917), the third was from five months earlier, in May 2011 (R. 910). Moreover, unlike in *Voigt v. Colvin*, 781 F.3d 871, 875 (7th Cir. 2015), Ms. Gaines's GAF scores did not "bounce around a great deal," depending on how she was feeling on a particular day. In *Voigt*, the claimant's GAF scores ranged widely, from 50 to 70; by contrast, Ms. Gaines's GAF scores consistently ranged between 48 and 51, signifying serious mental illness.[6]

In addition, the ALJ does not explain how he came to the conclusion that Ms. Gaines's GAF scores were inconsistent with the evidence showing only "moderate symptoms" of mental illness. To the contrary, the ALJ acknowledged that many of Ms. Gaines's pain behaviors, while not having an identifiable physical cause, may signify serious psychiatric illness (R. 17). While "a low GAF score alone is insufficient to overturn an ALJ's finding of no disability . . . taking the GAF scores in context helps reveal the ALJ's insufficient consideration of all the evidence" of Ms. Gaines's mental impairments, which may show a claimant struggling with serious mental health issues. *Bates*, 736 F.3d at 1099 n.3.

---

[6] A GAF score of between 41 and 50 signifies serious psychiatric illness. We note, however, that in 2013, after the ALJ here issued his decision, the fifth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014).

Therefore, the ALJ's findings as to Ms. Gaines's mental impairments were not supported by substantial evidence.

## CONCLUSION

"We want to emphasize here that we are not suggesting that the ALJ was required to reach a certain conclusion regarding the nature of" Ms. Gaines's pain and mental impairments. *Moore*, 743 F.3d at 1124. It is clear that the ALJ harbored serious doubts as to the true extent of Ms. Gaines's functional limitations. However, once the ALJ determined that Ms. Gaines suffered from severe physical and mental impairments and psychologically-based pain, the ALJ was required to either account for limitations from the pain and impairments in the RFC or explain adequately why he did not do so.

For the reasons stated above, we grant Ms. Gaines's motion to remand (doc. # 9) and deny the Commissioner's motion to affirm (doc. # 17). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATE: May 6, 2015